******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., dissenting. I agree with the majority that our decision in *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 708, 41 A.3d 1013 (2012), did not establish a presumptive benchmark range for damages awards in emotional distress cases before the Commission on Human Rights and Opportunities (CHRO). "For more than fifty years," the majority explains, "this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." Part I of the majority opinion. My problem with the majority's holding is that, in the very next breath, it approves and endorses the use by the CHRO's human rights referee (referee) of a valuation method that employs just such a yardstick to constrain the award of noneconomic damages in the present case. Specifically, the referee used a handful of old CHRO awards to arrive at a definitive range of emotional distress damages with a "high water mark" of $50,000, and a low end of $6000. In arriving at this range, the referee refused to consider in her comparative valuation a vast reservoir of awards made by courts, juries, and other administrative agencies charged with the responsibility of valuing the emotional distress suffered by complainants, like the complainant in this case, Kelly Howard, who have endured illegal racial discrimination. The referee's chosen valuation methodology adopts a self-imposed, artificial, and arbitrary measure of damages for which I can find no judicial, legislative, or regulatory authority. Reversal is required so that a damages award can be calculated using a proper valuation methodology.

The referee's use of an unjustifiably restrictive valuation methodology is no accident. My research reveals that some or all of the current CHRO referees evidently have reached an informal consensus, with no official guidance, authorization, or approval, that the emotional distress damages awarded by courts, juries, and other administrative agencies in comparable cases are too high. Their chosen valuation methodology reflects an unofficial but deliberate policy choice to keep CHRO awards low. In implementing this policy, the referees have created a self-contained and self-replicating universe of comparative values that categorically excludes consideration of any awards other than those produced in-house at the CHRO. This practice should end, and this court should end it, because the referees have no authority to adopt a presumptive valuation range that, whether by design or in effect, produces emotional distress damages awards far lower than permitted by law.

I likewise find unjustifiable the referee's failure to account for inflation when relying on past CHRO awards,

some decades old, to determine the value of the complainant's emotional distress. The referee awarded $15,000 to the complainant in the present case based on the referee's conclusion that the closest comparable awards were a CHRO award of $20,000 in 2000, an award of $25,000 in 2006, and—curiously—an award of no damages in 2008 resulting from a finding that there was no violation of Connecticut's discriminatory housing practice statute, General Statutes § 46a-64c.[1] See footnote 11 of this opinion. The referee also took into consideration awards to a husband and wife of $12,000 and $10,000 in 2008, and an award of $6000 in 2000. See id. The referee did not adjust any of these comparative values for inflation, despite the obvious and inarguable fact that the value of a dollar in 2000, 2006, and 2008 was significantly less than the value of a dollar in 2017, which is when the damages originally were awarded to the complainant in this case. For example, an award of $20,000 in 2000, adjusted for inflation, was worth approximately $29,000 in 2017.[2] The failure to account for inflation caused the referee to substantially undervalue the damages award in this case.

I

It is important to properly frame the precise nature of the errors committed by the referee in order to ascertain the correct standard of appellate review. To be clear, I do not quarrel with the referee's factual findings. Although I probably would have arrived at materially different findings than the referee did regarding the character and degree of the emotional distress suffered by the complainant, it is not the function of this court "to retry the case or to substitute its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Connecticut Judicial Branch* v. *Gilbert*, 343 Conn. 90, 135, 272 A.3d 603 (2022). Although the majority and I seem to agree that the size of the damages award reflects a distinctly parsimonious sensibility, we are required to defer to the referee's wide discretion in that regard. See, e.g., *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 81, 272 A.3d 639 (2022) ("[a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts" (internal quotation marks omitted)); cf. *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 783, 882 A.2d 653 (2005) ("[t]he amount of a damage[s] award is a matter peculiarly within the province of the trier of fact" (internal quotation marks omitted)).

The errors at issue, however, are not factual. Nor do they involve the nature or extent of the emotional distress suffered by the complainant as a result of the discriminatory conduct of the named defendant, Richard Cantillon. The errors are *methodological*. After the referee assessed the severity of the complainant's emotional distress using the framework set forth in *Commission on Human Rights & Opportunities ex rel.*

*Harrison* v. *Greco*, Docket No. 7930433 (C.H.R.O. June 3, 1985) (*Harrison*),[3] the referee then applied a particular methodology to value that emotional distress, i.e., to convert the harm into dollars. I will review that valuation methodology in more detail in parts II and III of this opinion, but the critical point for present purposes is that the referee arrived at a valuation on the basis of a range of awards for emotional distress damages established by prior CHRO awards, to the exclusion of other relevant comparative data, and without taking into account the rate of inflation.[4]

The referee's selection of a valuation methodology presents a *legal* question on appeal because it raises the issue of whether a proper measure of damages has been employed to calculate the complainant's damages.[5] It is well established that, "[a]lthough the amount of recoverable damages is a question of fact, the measure of damages [on] which the factual computation is based is a question of law." (Internal quotation marks omitted.) *Oscar Gruss & Son, Inc.* v. *Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); see *Vermont Microsystems, Inc.*, v. *Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998) ("[a]lthough [the] calculation of the amount of damages is a factual determination, the formula used in making that calculation is a question of law"); *Carrillo* v. *Goldberg*, 141 Conn. App. 299, 307, 61 A.3d 1164 (2013) ("[w]e accord plenary review to the [trial] court's legal basis for its damages award" (internal quotation marks omitted)).[6]

The standard of review applied to legal determinations made by an administrative agency depends on a number of factors. "Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716, 6 A.3d 763 (2010).

The appropriate valuation methodology for emotional distress damages in discrimination cases has not previously been subjected to judicial scrutiny, and, therefore, I consider that narrow issue to present a pure question of law subject to plenary review.[7] See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 526, 93 A.3d 1142 (2014) (for pure questions of law, plenary review is applicable unless agency's interpretation has been subjected to judicial scrutiny or is time-tested and reason-

able); *Okeke* v. *Commissioner of Public Health*, 304 Conn. 317, 324, 39 A.3d 1095 (2012) (Under the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., "[a] reviewing court . . . is not required to defer to an improper application of the law. . . . It is the function of the courts to expound and apply governing principles of law." (Internal quotation marks omitted.)). Accordingly, we must resolve the legal question of whether the referee adopted the proper valuation methodology by limiting herself to a range of comparative cases that included only prior CHRO awards (and one jury award on remand) and excluded all other damages awarded for emotional distress caused by racial discrimination by courts, juries, and other administrative agencies, as well as the rate of inflation.

## II

CHRO referees evidently have been employing a valuation methodology for discrimination claims that arrives at a dollar value for emotional distress solely on the basis of a relatively small number of prior CHRO cases in which such damages were awarded. Little to no consideration is given to the robust comparative data available from numerous other sources of valuation in the juridical realm that assigns dollar amounts to this specific form of harm, namely, damages awards made by courts, juries, and other administrative agencies. In my view, the referee erred by adopting a methodology that disregards all valuation data except awards made by the CHRO itself.

It is well established that a referee charged with remedying a person's deprivation of civil rights protected by state and federal fair housing laws may award damages for emotional distress under General Statutes § 46a-86. See, e.g., *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 705, 855 A.2d 212 (2004) (emotional distress damages can be awarded under § 46a-86 (c)); *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, 213 Conn. App. 635, 651–52, 278 A.3d 607 (upholding emotional distress damages award under § 46a-64c), cert. denied, 345 Conn. 962, 285 A.3d 389 (2022). It is equally well established that the purpose of remedial awards under our antidiscrimination statutes is to make victims of discrimination "whole" and to deter "like discrimination in the future . . . ." (Internal quotation marks omitted.) *Connecticut Judicial Branch* v. *Gilbert*, supra, 343 Conn. 141; accord *Commission on Human Rights & Opportunities* v. *Board of Education*, supra, 694; see General Statutes § 46a-86 (c) ("upon a finding of a discriminatory practice prohibited by [among other provisions, General Statutes §§ 46a-58 and 46a-64c], the presiding officer *shall* determine the damage suffered by the complainant . . . as a result of such discriminatory practice" (emphasis added)); *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 478,

559 A.2d 1120 (1989) ("hearing officer[s] [have] not merely the power but the *duty* to render a decree which will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future" (emphasis added; internal quotation marks omitted)).

In recent years, it appears that CHRO referees have been relying almost exclusively on awards from their own agency when awarding damages for emotional distress, disregarding decisions that assess such damages from courts, juries, and other administrative agencies, such as the United States Department of Housing and Urban Development (HUD). See, e.g., *Commission on Human Rights & Opportunities ex rel. Lauray* v. *City Hall Café*, Docket No. 1530333, 2016 WL 1719121, *8 (C.H.R.O. March 31, 2016) (awarding $8000 for racial discrimination in violation of Connecticut Fair Employment Practices Act after reviewing only prior CHRO cases); *Commission on Human Rights & Opportunities ex rel. Jackson* v. *Pixbey*, Docket Nos. 0950094 and 0950095, 2010 WL 5517184, *7 (C.H.R.O. May 25, 2010) (awarding $40,000 in neighbor-on-neighbor, hostile housing environment case after reviewing only two CHRO cases); *Commission on Human Rights & Opportunities ex rel. Brown* v. *Jackson*, Docket Nos. 0750001 and 075002, 2008 WL 5122193, *24 (C.H.R.O. November 17, 2008) ("in recognition of the various awards order[ed] by [the CHRO]," awarding $12,000 to husband and $10,000 to wife as damages for hostile housing environment); *Commission on Human Rights & Opportunities ex rel. Scott* v. *Jemison*, Docket No. 9950020, 2000 WL 35575662, *1, *6, *9 (C.H.R.O. March 20, 2000) (awarding $6000 for emotional distress caused by housing discrimination after reviewing range of awards articulated in two prior CHRO decisions); *Commission on Human Rights & Opportunities ex rel. Little* v. *Clark*, Docket No. 9810387, 2000 WL 35575648, *13, *16 (C.H.R.O. August 2, 2000) (awarding $20,000 for emotional distress and noting that "[the requested] award of $75,000 [was] far out of line with the majority of awards ordered by [the CHRO]").

The referee in the present case followed this model. As the referee made clear in her memorandum of decision, she employed a valuation methodology limited solely to other CHRO comparators (and, on remand, one jury case), and deliberately excluded federal awards of damages for emotional distress. This unauthorized, arbitrary, and self-imposed limitation is not founded on law, logic, or principle, but on an unofficial, subjective assessment that the federal awards were too high. Indeed, to ensure that the valuation remained entirely uninfluenced by non-CHRO comparators, the referee declined to consider a few early CHRO cases that valued emotional harm on the basis of federal decisions, explaining that these awards were unreliable outliers because "[f]ederal awards for emotional distress in cases of

housing discrimination have consistently been much higher than awards from [the CHRO]." (Internal quotation marks omitted.), quoting *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, Docket No. 0550116, 2006 WL 4753467, *8 n.6 (C.H.R.O. October 26, 2006) (critiquing *Commission on Human Rights & Opportunities ex rel. Planas* v. *Bierko*, Docket No. 9420599 (C.H.R.O. February 8, 1995), and its reliance on federal decisions, including awards from courts, juries, and other administrative agencies, such as HUD, in calculating award of $75,000). The referee, quoting *Commission on Human Rights & Opportunities ex rel. Lawton* v. *Jansen*, Docket No. 0550135, 2007 WL 4623071, *8 n.10 (C.H.R.O. October 18, 2007), noted that *Planas* is " 'at the far end of the extreme of awards' " due, in part, to its reliance on federal cases. The referee therefore took the $75,000 award in *Planas* out of the list of comparator cases and established, as a "high water mark," an award of $50,000 on the basis of *Commission on Human Rights & Opportunities ex rel. Maybin* v. *Berthiaume*, Docket No. 9950026 (C.H.R.O. March 29, 1999) (*Maybin*).[8]

Federal awards for emotional distress caused by housing discrimination were not the only comparators excluded from the referee's valuation methodology. The referee also categorically disregarded jury awards for emotional distress caused by racial discrimination. It was not until the trial court ordered the referee on remand to consider *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 679, that the referee reluctantly included *Patino* (and only *Patino*) in her valuation as the single non-CHRO damages award comparator.

The referee gave no legitimate reason to explain why she did not consider jury verdicts as part of her valuation of emotional distress damages. The referee stated that a comparison of values using jury verdicts is not possible because jury verdicts are unaccompanied by any explanation from the jury as to why it arrived at the amount of the award.[9] This assertion misses the point. The jury awards warranting consideration as comparators are those awards—and there are many of them—that are subject to judicial review, typically either for inadequacy or excessiveness. As in *Patino*, that review process results in a published judicial decision containing sufficient factual and contextual information to allow a judge—and a CHRO referee—to assess the evidence bearing on the jury's valuation and to use the data as a point of comparison, precisely as the referee in this case used the CHRO's own awards (and the *Patino* case) as comparators.[10] The referee's legal conclusion—that jury awards cannot be used as comparators because the jury does not explain its verdict—is erroneous.

The refusal to consider emotional distress damages awarded by courts, juries, and other administrative

agencies as comparators led the referee in the present case to award the complainant $15,000, an award the referee fashioned on the basis of a data set consisting of nothing more than a few relatively dated CHRO decisions[11] establishing a presumptive range with a low end of $6000 and a high end of $50,000. The referee concluded that $15,000 was an appropriate award because it fell "well within the realm of compensatory awards ordered in similar cases decided by [the CHRO]." By plotting the complainant's emotional harm within a range of values established by a handful of prior CHRO awards, the referee operated within an artificially and arbitrarily limited framework that required her award to fall within a presumptive range far narrower than that permitted by law. This constraint on the amount of damages awarded to the complainant is an error of law that necessitates reversal.

A number of inexplicable incongruities arise as a result of this court's decision today. First, the majority endorses the referee's use of an unauthorized, self-imposed constraint on the award of emotional distress damages by employing a presumptive range of damages with a low end of $6000 and a high end of $50,000, while rejecting the higher presumptive range taken from *Patino* because it constrains the referee's discretion.[12] Of even more concern, the range of damages used in the present case is derived solely from prior CHRO awards, whereas the range of damages described in *Patino* is based on federal jury verdicts. See *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 708. Jury verdicts are a more reliable indicator of the value to ascribe to emotional distress damages because each verdict is arrived at independently and, thus, provides a separate and distinct data point for comparison. By contrast, the range of awards for comparative purposes under the referee's methodology is strictly limited to a small number of awards previously made by the CHRO, and no one else. Moreover, a range established by prior CHRO decisions exists as a closed system—there is no fresh data to update or modify the referee's pool of comparative data because any "new" agency awards are themselves derived from prior valuations, and the system is therefore self-replicating. The valuation range derived from jury awards, by contrast, is subject to constant revision as the data set of comparators expands because these awards are made without consideration of other jury awards.[13]

Second, this is not a context in which the administrative agency can claim that deference is due because the agency possesses particular, technical expertise in the subject matter; there is no reason to think that CHRO referees are any better than juries or federal agencies at valuing emotional distress caused by racial discrimination. Given the inherent difficulty of assessing emotional distress damages, it seems obvious to me that the more valuation data utilized, the more accurate,

just, and fair the assessment of damages will be. As the majority acknowledges, damages for intangible harms, such as pain, suffering, and emotional distress, "lie in an extremely uncertain area . . . in which it is quite impossible to assign values with any precision . . . . [N]o formulaic process of review [for excessiveness or inadequacy] applies . . . ." (Internal quotation marks omitted.) Part I of the majority opinion; see *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 287, 25 A.3d 632 (2011) (recognizing that "[the] limits of fair and reasonable compensation in [a] particular case" are "necessarily uncertain" (internal quotation marks omitted)); see also *Stampf* v. *Long Island Railroad Co.*, 761 F.3d 192, 205 (2d Cir. 2014) ("Awards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress."). The availability of data about what other decision makers have done under comparable circumstances provides a very useful reference point for those charged with the responsibility of navigating this uncertain landscape. One would think that CHRO referees assigned with the responsibility of awarding money damages for emotional distress would see a great benefit in consulting all relevant data—including damages awarded by courts, juries, and other administrative agencies in comparable cases—before undertaking the humbling task of telling the victim of discrimination the value of his or her suffering in the eyes of the law.

Such guidance is particularly important when a decision maker is trying to fix a monetary value to the unique kind of emotional harm caused by racial discrimination. Many other forms of emotional distress are assessed on a strictly individual basis because the effects tend to be idiosyncratic to the individual victim. Group based racial discrimination is different. The wrongful act of discrimination itself, as well as the harm caused to the victim, inherently contains a shared, collective dimension, as one would expect of illegal conduct that achieves its goal through the weaponization of the deeply embedded history of racism in our country. The harm that each individual suffers will be different, of course, and must be assessed on an individual basis, but we cannot ignore the reality that racial discrimination has very powerful social and cultural dimensions that necessarily impact the nature and extent of the resulting psychic harm. There is substantial evidence, for example, that racial discrimination in America has such a deep, pervasive, and persistent place in our history that the harm it causes is especially profound.[14]

Given the unique nature of the harm caused by racial discrimination, and in light of the fact that the valuation of emotional distress is not a matter of science, there is particular benefit in consulting jury awards for comparative purposes. The jury system has its flaws, but there are certain contexts in which jurors have an espe-

cially important role in our system of justice as representatives of the conscience of the community. See *Carter* v. *Jury Commission of Greene County*, 396 U.S. 320, 330, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970) ("the very idea of a jury . . . [is of] a body truly representative of the community" (internal quotation marks omitted)); *United States* v. *Gilliam*, 994 F.2d 97, 101 (2d Cir.) (jurors are "representatives of the people"), cert. denied, 510 U.S. 927, 114 S. Ct. 335, 126 L. Ed. 2d 280 (1993); *United States ex rel. McCann* v. *Adams*, 126 F.2d 774, 776 (2d Cir. 1942) (jury "introduces a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions"), rev'd on other grounds, 317 U.S. 269, 63 S. Ct. 236, 87 L. Ed. 268 (1942); *McKirdy* v. *Cascio*, 142 Conn. 80, 84, 111 A.2d 555 (1955) (amount of award in wrongful death actions was within province of jury given inherently speculative nature of harm). Our juries' assessment of the harm caused by racial discrimination strikes me as one such situation, and such awards should not be excluded from a CHRO referee's valuation unless the law requires otherwise.

Jury awards are not the only relevant data that was categorically excluded from consideration by the CHRO referee. Other administrative agencies, such as HUD, are also charged with the responsibility of awarding damages for emotional distress caused by unlawful racial discrimination. See, e.g., 42 U.S.C. § 3612 (g) (3) (2018) ("[i]f the administrative law judge finds that a respondent has engaged or is about to engage in a discriminatory housing practice, such administrative law judge shall promptly issue an order for such relief as may be appropriate, which may include actual damages suffered by the aggrieved person and injunctive or other equitable relief"); 24 C.F.R. § 180.670 (b) (3) (i) (2022) ("If the [administrative law judge] finds that a respondent has engaged, or is about to engage, in a discriminatory housing practice, the [administrative law judge] shall issue an initial decision against the respondent and order such relief as may be appropriate. Relief may include, but is not limited to . . . [o]rdering the respondent to pay damages to the aggrieved person (*including damages caused by humiliation and embarrassment*)." (Emphasis added.)). These awards likewise provide valuable data points for CHRO referees to consider. Looking at this data would be especially useful in cases like the present one, in which a victim of discrimination has alleged harm under the federal Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., and our state equivalent, § 46a-64c. In fact, we consistently have recognized that the § 46a-64c is intended to be applied in a manner consistent with its federal equivalent, with any deviation typically providing only greater protections to citizens of this state than under the federal counterpart. See, e.g., *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium*

*Assn., Inc.*, 273 Conn. 373, 385, 870 A.2d 457 (2005) (§ 46a-64c was adopted with "the intent of creating a state antidiscrimination housing statute [that is] consistent with its federal counterpart"); id., 386 n.11 ("[our courts] have interpreted our statutes even more broadly than their federal counterparts, to provide *greater* protections to our citizens, especially in the area of civil rights" (emphasis in original)); see also *Commission on Human Rights & Opportunities* v. *Housing Authority*, 117 Conn. App. 30, 46, 978 A.2d 136 (2009) ("[o]ne of the purposes of [Connecticut's fair housing] scheme is to render it substantially equivalent to the federal scheme, in terms of protecting the policy against housing discrimination and the rights of persons subject to such discrimination"), appeal dismissed, 302 Conn. 158, 24 A.3d 596 (2011). Given the intent and purpose animating § 46a-64c, I see no reason for the CHRO to ignore these federal administrative agency awards.

Lest I be misunderstood, I do not intend to suggest that the ultimate focus of the valuation analysis should shift away from the particular facts of each individual case. CHRO referees "must rely primarily on [case specific] facts relating to the severity of the discriminatory behavior and [the] duration of the resulting emotional damage." *Broome* v. *Biondi*, 17 F. Supp. 2d 211, 225 (S.D.N.Y. 1997). A victim's individual experience is paramount, and awards made in other cases are merely instructive, not dispositive or presumptive. But CHRO referees who utilize a comparative valuation methodology are not properly discharging their statutory responsibilities by adopting a comparative methodology that, by design, excludes a large universe of damages awarded by courts, juries, and other administrative agencies in racial discrimination cases.[15] Expanding the universe of comparators that referees utilize can help to ensure that the damages award in each individual case is fair. The more data, the better. See *Zakre* v. *Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 568 (S.D.N.Y. 2008) ("[r]eference to other awards in similar cases is appropriate . . . but courts must take care not to limit their review too narrowly" (citation omitted; internal quotation marks omitted)), aff'd, 344 Fed. Appx. 628 (2d Cir. 2009); cf. *Broome* v. *Biondi*, supra, 225 (comparing emotional distress damages between employment and housing discrimination claims is not improper). Of course, if a referee finds that a case is a bad data point because of factual differences, the referee has the discretion to reject the purported comparator.

A more robust comparative award approach than the one employed by the referee in this case reveals that there is a general trend within the United States Court of Appeals for the Second Circuit to award damages greater than the "high water mark" of $50,000, with awards often sitting closer to or well into the six figures for "garden variety"[16] emotional distress in civil rights cases. See, e.g., *Lewis* v. *American Sugar Refining,*

*Inc.*, 325 F. Supp. 3d 321, 364 (S.D.N.Y. 2018) ("[a]wards [for] garden-variety emotional distress or mental anguish in the Second Circuit range from $30,000 to $125,000"); *Olsen* v. *Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (same); *Watson* v. *E.S. Sutton, Inc.*, Docket No. 02 Civ. 2739 (KMW), 2005 WL 2170659, *16 (S.D.N.Y. September 6, 2005) (same), aff'd, 225 Fed. Appx. 3 (2006); see also *Lore* v. *Syracuse*, 670 F.3d 127, 176–80 (2d Cir. 2012) ($150,000 award for emotional distress); *Parris* v. *Pappas*, 844 F. Supp. 2d 271, 277–79 (D. Conn. 2012) ($100,000 award in compensatory damages for FHA violation).[17]

The majority cites to *Manson* v. *Friedberg*, Docket No. 08 Civ. 3890 (RO), 2013 WL 2896971, *7 (S.D.N.Y. June 13, 2013), which posits that there is a much lower range of damages, between $5000 and $35,000, for garden-variety emotional distress damages. See part I of the majority opinion. The majority cites *Manson* for the proposition that the higher range in *Olsen* "is hardly a rule." Id. I agree that none of these ranges should serve as a rule, but it is important to note that the range cited in *Manson* is generally viewed as outdated and that cases that award damages within that lower range are typically seen as outliers. See, e.g., *Equal Employment Opportunity Commission* v. *United Health Programs of America, Inc.*, Docket No. 14-CV-3673 (KAM) (JO), 2020 WL 1083771, *13 (E.D.N.Y. March 6, 2020) ("[t]he court will not cap [garden-variety] emotional distress damages at $35,000 on the basis of *Moore* [v. *Houlihan's Restaurant, Inc.*, Docket No. 07-CV-3129 (ENV) (RER), 2011 WL 2470023, *6 (E.D.N.Y. May 10, 2011)], an outlier among recent cases in this circuit, and which cites to *Rainone* [v. *Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005)] for its damages range [of $5000 to $35,000], a case that courts have acknowledged is quite outdated and is now considered a [lower than normal] damages range"); *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46 n.4 (rejecting defendants' reliance on *Rainone* for damages range of $5000 to $35,000 and noting that "[m]ore recent cases find this range to be significantly higher"); see also, e.g., *Watson* v. *E.S. Sutton, Inc.*, supra, 2005 WL 2170659, *15 (range of $5000 to $30,000 was "at the low end of the range of damages generally awarded under New York law"); A. Merjian, "Nothing 'Garden Variety' About It: Manifest Error and Gross Devaluation in the Assessment of Emotional Distress Damages," 70 Syracuse L. Rev. 689, 699 (2020) ($5000 to $35,000 range was derived from outdated 1999 law review article, which omitted many Second Circuit cases in which awards were well above $35,000).

I am very concerned not only that the referee in the present case applied a presumptive range for awarding emotional distress damages in CHRO proceedings, but deliberately selected a range drawn exclusively from a small group of prior CHRO awards for the purpose of keeping CHRO awards low. This unofficial and unautho-

rized methodology now serves as a self-replicating and self-contained precedential source for future administrative adjudications in Connecticut. Its purpose and effect are to constrain the referees to award damages lower than those authorized by law. Under current law, if CHRO referees apply a comparative value methodology, they must look beyond the narrow confines of prior CHRO awards to consider comparable awards made in like cases by other decision makers, including courts, juries, and other relevant administrative agencies. A larger and more representative pool of comparators will ensure that awards for emotional distress are fair, just, and reasonable.

### III

The referee's valuation methodology also was flawed because she failed to account for inflation when she used prior awards to arrive at a damages award in the present case. As I discussed previously, the referee established a range of $6000 to $50,000 for emotional distress damages on the basis of CHRO awards made between 1998 and 2010. Of those awards, the referee found three decisions particularly instructive in valuing the complainant's harm: *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, supra, 2006 WL 4753467, *10 (awarding $25,000 for emotional distress), *Commission on Human Rights & Opportunities ex rel. Little* v. *Clark*, supra, 2000 WL 35575648, *16 (awarding $20,000 for emotional distress), and *Commission on Human Rights & Opportunities ex rel. McIntosh-Waller* v. *Vahistrom*, Docket No. 0750080, 2008 WL 2683291, *8–9 (C.H.R.O. June 6, 2008) (no damages were awarded because no liability was found).[18] The referee's valuation methodology was erroneous as a matter of law because she used these historical awards without adjusting for inflation.

It is crystal clear that an adjustment for inflation is necessary under these circumstances.[19] The Second Circuit has emphasized the importance of considering the passage of time and inflation when utilizing a comparative award approach to review jury damages awards for excessiveness. See, e.g., *Meacham* v. *Knolls Atomic Power Laboratory*, 381 F.3d 56, 78 (2d Cir. 2004) ("the passage of time since [those] cases were decided could reasonably support higher verdicts"), vacated on other grounds sub nom. *KAPL, Inc.* v. *Meacham*, 544 U.S. 957, 125 S. Ct. 1731, 161 L. Ed. 2d 596 (2005); *DiSorbo* v. *Hoy*, 343 F.3d 172, 185 (2d Cir. 2003) ("when considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for [the plaintiff's] injuries today is higher than what it would have been ten years ago"); *Luciano* v. *Olsten Corp.*, 912 F. Supp. 663, 673 (E.D.N.Y. 1996) ("an amount that may have been excessive five to ten years ago . . . may be reasonable today simply by virtue of inflation"), aff'd, 110 F.3d 210 (1997). A dollar in 1998 was worth

considerably less than a dollar in 2017. To achieve equivalency, the referee in 2017 would need to award approximately $1.50 for every dollar awarded nineteen years earlier. See Bureau of Labor Statistics, United States Department of Labor, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 23, 2023). The referee failed to account for inflation when she relied on past awards to calculate the amount of the complainant's emotional distress damages, and, therefore, her valuation methodology was fundamentally flawed.

IV

Our legislature has placed the responsibility of compensating victims of racial discrimination on the CHRO. The CHRO has a duty to ensure that victims of racial discrimination are properly compensated in accordance with the law. See, e.g., *State* v. *Commission on Human Rights & Opportunities*, supra, 211 Conn. 478. In order to fulfill this duty using a comparative valuation methodology, CHRO referees may not limit their analysis of comparative data to prior CHRO cases only. Nor may they fail to adjust past awards to account for the rate of inflation. Because the referee in the present case used a flawed valuation methodology to calculate the complainant's award of damages, the Appellate Court's judgment must be reversed. Accordingly, I respectfully dissent.

[1] It was manifestly erroneous for the referee to value the complainant's emotional distress using a comparator case in which no liability for unlawful discrimination was found, and thus no compensable damages were awarded as a matter of law. See *Commission on Human Rights & Opportunities ex rel. McIntosh-Waller* v. *Vahistrom*, Docket No. 0750080, 2008 WL 2683291, *8–9 (C.H.R.O. June 6, 2008).

[2] Likewise, an award of $6000 in 2000 is the equivalent of approximately $8600 in 2017 dollars. See Bureau of Labor Statistics, United States Department of Labor, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 23, 2023).

[3] *Harrison* instructs CHRO referees to consider the following factors when awarding emotional distress damages caused by discrimination: (1) the subjective internal emotional reaction of the complainant; (2) whether the discrimination occurred in front of other people; and (3) the degree of offensiveness of the discrimination and its impact on the complainant. See *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, Docket No. 7930433. Like the majority, I am not entirely convinced that the *Harrison* factors represent a proper framework for assessing emotional distress damages, especially in cases like the one before us. See part II of the majority opinion. The parties, however, have not challenged the legal validity of the *Harrison* factors, and, therefore, I do not address the issue.

[4] On remand, the referee also applied *Patino* as a comparator, but only because she was ordered to do so by the trial court.

[5] This presents an issue of law because the valuation methodology itself was formulated on the basis of generally applicable principles regarding the range of damages recoverable for emotional distress caused by racial discrimination, without regard to the underlying facts of this particular case. See *Lysenko* v. *Sawaya*, 7 P.3d 783, 787 (Utah 2000) ("Questions of fact are generally regarded as entailing the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind. . . . Legal questions, in contrast, are defined as those [that] are not of fact but are essentially of rules or principles uniformly applied to persons of similar qualities and status in similar circumstances. . . . Thus, to determine whether the measure of damages . . . presented the trial court with a legal question . . . [the court] must determine whether there is a [rule] or [principle] governing the measure of damages that can

be uniformly applied to persons of similar qualities and status in similar circumstances." (Citations omitted; internal quotation marks omitted.)). The *application* of that damages model to the particular facts of the case—e.g., whether the complainant's emotional distress fits within the selected range of damages—is a mixed question of law and fact that is entitled to deference. See General Statutes § 4-183 (j). This latter issue is not contested in the present case.

[6] Damages assessed after the entry of default are no different. After default is entered, establishing the appropriate amount of damages involves two steps: (1) "determining the proper rule for calculating damages on . . . a claim," and (2) "assessing [the] plaintiff's evidence supporting [the] damages to be determined under this rule." (Internal quotation marks omitted.) *Pelgrift* v. *335 W. 41st Tavern, Inc.*, Docket No. 14-CV-8934 (AJN), 2018 WL 4735705, *3 (S.D.N.Y. September 30, 2018), appeal dismissed, United States Court of Appeals, Docket No. 18-3283 (2d Cir. February 12, 2019); see *Steiger* v. *J. S. Builders, Inc.*, 39 Conn. App. 32, 33, 35, 663 A.2d 432 (1995) ("the trial court applied the wrong standard in calculating the award of attorney's fees" after default judgment was entered against defendants).

[7] Even if the referee's valuation methodology were entitled to deference, I would conclude, for the reasons explained in parts II and III of this opinion, that the referee's exclusion of emotional distress damages awarded by courts, juries, and other administrative agencies to ascertain the value of the complainant's harm, as well as her failure to account for the passage of time and rate of inflation, was arbitrary, capricious, and an abuse of discretion.

[8] Although the referee set the top of the range for emotional distress damages at $50,000 on the basis of the CHRO's prior damages award in *Maybin*, she also treated *Maybin* as an outlier, in part because "[t]he basis for the $50,000 emotional distress award rest[ed] primarily on the aggressive monetary award in *Planas*, on a trend in certain appellate decisions [that] have encouraged hearing officers to be aggressive in the award of [compensatory] damages . . . and on awards in other jurisdictions." (Citation omitted; internal quotation marks omitted.)

[9] The referee also explained that "Connecticut courts have yet to issue an award of compensatory damages in a case involving a housing discrimination claim based on hostile environment harassment . . . ." (Footnote omitted.) This does not, however, explain the referee's failure to consider state jury awards for emotional distress in other contexts, such as employment discrimination.

[10] Indeed, when the trial court remanded the present case to the referee with instruction to reconsider the award of emotional distress damages in light of *Patino*, the referee had no difficulty comparing the underlying facts with those presented in *Patino* and concluding, as was her prerogative, that the harm was worse in *Patino* than it was in this case.

[11] The referee relied on the following comparators, from high to low, in creating this presumptive range: (1) *Commission on Human Rights & Opportunities ex rel. Maybin* v. *Berthiaume*, supra, Docket No. 9950026 ($50,000 emotional distress damages award in hostile housing environment case), (2) *Commission on Human Rights & Opportunities ex rel. Jackson* v. *Pixbey*, supra, 2010 WL 5517184, *8–9 ($40,000 emotional distress damages award in hostile housing environment case), (3) *Commission on Human Rights & Opportunities ex rel. Jackson* v. *Lutkowski*, Docket Nos. 0950094 and 0950095 (C.H.R.O. May 25, 2010) ($40,000 emotional distress damages award in hostile housing environment case), (4) *Commission on Human Rights & Opportunities ex rel. Lawton* v. *Jansen*, supra, 2007 WL 4623071, *1, *9 ($40,000 emotional distress damages award in hostile housing environment case), (5) *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, supra, 2006 WL 4753467, *10 ($25,000 emotional distress damages award in hostile housing environment case), (6) *Commission on Human Rights & Opportunities ex rel. Thomas* v. *Mills*, Docket No. 9510408 (C.H.R.O. August 5, 1998) ($25,000 emotional distress damages award in public accommodations case), (7) *Commission on Human Rights & Opportunities ex rel. Brown* v. *Jackson*, supra, 2008 WL 5122193, *24 ($22,000 emotional distress damages award in hostile housing environment case), (8) *Commission on Human Rights & Opportunities ex rel. Little* v. *Clark*, supra, 2000 WL 35575648, *1, *16 ($20,000 emotional distress damages award in hostile environment discrimination case), (9) *Commission on Human Rights & Opportunities ex rel. Scott* v. *Jemison*, supra, 2000 WL 35575662, *1 ($6000 emotional distress damages award in hostile housing environment case); (10) *Commission on Human Rights & Opportunities ex rel. McIn-*

*tosh-Waller* v. *Vahistrom*, Docket No. 0750080, 2008 WL 2683291, *8–9 (C.H.R.O. June 6, 2008) (no damages were awarded because no liability was found in hostile housing environment case).

[12] In my view, neither the jury awards nor the CHRO awards should create a presumptive range; the referee should consider as comparators administrative and judicial awards (including jury awards) for emotional distress caused by similar acts of illegal racial discrimination, and either accept or reject the comparison based on the similarity or dissimilarity or the underlying facts, not the identity of the decision maker.

[13] The majority relies on our case law regarding additur and remittitur to conclude that "benchmarking a challenged award against awards in other cases is not required or even, necessarily, appropriate" because "comparisons with amounts in other verdicts serve little purpose." (Internal quotation marks omitted.) Part I of the majority opinion. I agree with the majority that a comparison to other jury awards normally is unhelpful to determine whether a jury award in any particular case is inadequate or excessive, because "[j]uries may differ widely in the conclusions [that] they reach in what may be apparently similar cases, and, in fact, in any given case one jury may arrive at a result substantially different from that of another jury." (Internal quotation marks omitted.) *Munn* v. *Hotchkiss School*, 326 Conn. 540, 579, 165 A.3d 1167 (2017). As we previously have observed, "[t]his flexibility, though it may lead to uncertainty, is a necessary concomitant of the jury system as it operates in cases of this nature." *Birgel* v. *Heintz*, 163 Conn. 23, 34, 301 A.2d 249 (1972). Indeed, jurors are not allowed to learn about awards in other cases. But CHRO referees are not jurors; they are administrative decision makers who arrive at a fair and just valuation of emotional distress damages by reference to damages awards for emotional distress in other cases involving comparable facts. For comparative purposes, it is irrelevant whether the other awards are made by courts, juries, or other administrative agency adjudicators, so long as they represent a fair and fitting valuation of emotional distress damages under factually comparable circumstances.

[14] The United States Supreme Court, lower federal courts, this court, and legal scholars all have remarked on the severe, pervasive, and often irreversible harm caused by racial discrimination. See, e.g., *Brown* v. *Board of Education*, 347 U.S. 483, 494, 74 S. Ct. 686, 98 L. Ed. 873 (1954) ("[t]o separate [children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone"); *Mardell* v. *Harleysville Life Ins. Co.*, 65 F.3d 1072, 1074 (3d Cir. 1995) ("[a] victim of discrimination suffers a dehumanizing injury as real as, and often of far more severe and lasting harm than, a blow to the jaw" (internal quotation marks omitted)); *State* v. *Liebenguth*, 336 Conn. 685, 703–704, 250 A.3d 1 (2020) ("[I]t is beyond question that the use of the [N] word . . . is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. . . . [I]t is probably the single most offensive word in the English language." (Citations omitted; internal quotation marks omitted.)); see also V. Goode & C. Johnson, "Emotional Harm in Housing Discrimination Cases: A New Look at a Lingering Problem," 30 Fordham Urban L.J. 1143, 1148 (2003) ("Emotional harm claims in housing discrimination cases tend to subtly reflect the shadow of racism in this country. It is the persistence of segregated housing patterns that contributes to a lack of understanding of the impact of racism and a diminished sense of empathy that is so essential in compensating the full nature of the dignitary harm that flows from housing discrimination." (Footnote omitted.)).

[15] For purposes of this appeal, I need not venture an opinion on the particular number of cases, or the ratio of CHRO cases to non-CHRO cases, that should be considered by the referee to provide a sufficiently representative pool of data. I would be loathe to encourage judicial micromanagement at that level of detail. It is enough in the present case to say that the categorical exclusion of all comparators except CHRO awards (and one jury award on remand) was improper.

[16] As the majority recognizes, the "term 'garden-variety'" refers to emotional distress that is established primarily through a plaintiff's own testimony, rather than through medical or psychological evidence. Footnote 3 of the majority opinion. I agree with the majority that the term "is a bit of a misnomer" in that it appears to trivialize an individual's experience with emotional distress. Id.; see A. Merjian, "Nothing 'Garden Variety' About It: Manifest Error and Gross Devaluation in the Assessment of Emotional Distress Damages," 70 Syracuse L. Rev. 689, 693 (2020) ("There is nothing

'[garden-variety]' about the experience of discrimination. Discrimination is never 'commonplace' or 'forgettable,' common synonyms for this phrase.").

[17] The $30,000 to $125,000 range derives primarily from cases decided in the mid-2000s. This range would be much higher today after adjusting to account for inflation. As I explain in part III of this opinion, when conducting a comparative methodological approach to assess emotional distress damages, it is vital to account for the passage of time.

[18] See footnote 1 of this opinion.

[19] In *Moore* v. *Moore*, 173 Conn. 120, 376 A.2d 1085 (1977), this court held that our courts may take judicial notice of the "fact of inflation . . . without affording [the parties] an opportunity to be heard . . . ." Id., 123. To the extent that the rate of inflation may be subject to reasonable factual dispute; see id.; the parties are free to proffer evidence regarding the rate of inflation. In the absence of evidence, the rate of inflation, as reflected by governmental statistics, such as those provided by the United States Department of Labor, should be presumed. See Bureau of Labor Statistics, United States Department of Labor, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 23, 2023).

---